## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

|  |  |
|---|---|
| OMAR AQEL & | ) |
| IHSAN TALIAH ABDUR-RAHMAN, | ) |
|  | ) |
| Plaintiffs, | ) |
|  | ) |
| v. | ) |
|  | ) Case Number: 1:07CV01765(HHK) |
| EMILIO T. GONZALEZ, Director, | ) |
| U.S. Citizenship and Immigration Services, <u>et al.</u> | ) |
|  | ) |
| Defendants. | ) |

_____)

### MOTION TO DISMISS OR TRANSFER

Defendants Emilio T. Gonzalez, et al., through undersigned counsel, hereby move for

dismissal of the complaint pursuant to Rule 12(b)(1) for lack of jurisdiction or, in the alternative,

pursuant to Rule 12(b)(6) for failure to state a claim.  In the alternative, Defendants move that

the case be transferred to the Eastern District of Virginia.  A proposed order and memorandum of

points and authorities are attached hereto.

Dated: January 9, 2008                    Respectfully submitted,

_____
JEFFREY A. TAYLOR, D.C. BAR # 498610
United States Attorney


_____
RUDOLPH CONTRERAS, D.C. BAR #434122
Assistant United States Attorney


_____
ROBIN M. MERIWEATHER, D.C. Bar. # 490114
Assistant United States Attorney
555 Fourth St., N.W.
Washington, D.C.  20530
Phone: (202) 514-7198 Fax: (202) 514-8780
Robin.Meriweather2@usdoj.gov

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____
                                          )
OMAR AQEL &                               )
IHSAN TALIAH ABDUR-RAHMAN,                 )
                                          )
            Plaintiffs,                    )
                                          )
      v.                                   )
                                          )  Case Number: 1:07CV01765(HHK)
EMILIO T. GONZALEZ, Director,             )
U.S. Citizenship and Immigration Services, <u>et al.</u>  )
                                          )
            Defendants.                    )
_____)

**MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS OR IN THE
ALTERNATIVE TO TRANSFER**

**<u>INTRODUCTION AND SUMMARY</u>**

Congress has expressly withdrawn federal court jurisdiction over the discretionary

judgments, actions, and decisions United States Citizenship and Immigration Services

("USCIS") makes when reviewing petitions for immigration benefits.  Nonetheless, Plaintiffs

Omar Aqel ("Aqel") and Ihsan Taliah Abdur-Rahman ("Abdur-Rahman") (collectively

Plaintiffs) ask this Court to intervene in that process, and order USCIS to complete its

adjudication of  Form I-130 "Petition for Alien Relative" and Form I-485 "adjustment of status"

application Plaintiffs filed to seek lawful permanent resident status for Aqel.  USCIS has not

completed its adjudication of Plaintiffs' I-130 petition and I-485 applications because the

national security screenings - which the FBI conducts for all adjustment applicants - are not yet

complete.  The Court lacks jurisdiction to intervene in the adjudication process, and Plaintiffs'

complaint should be dismissed.

Assuming <u>arguendo</u> that this Court did have subject matter jurisdiction to review Plaintiffs' challenge to the pace of USCIS's adjudication of the I-130 petition and I-485 application, they would be unable to state a claim for unreasonable agency delay. The D.C. Circuit has identified several factors courts should consider when determining whether an agency has unreasonably delayed final action, two of which are particularly significant here. First, as noted, there is no statutory timetable for adjudicating adjustment applications. Second, USCIS and the FBI have an interest in processing adjustment applications and background checks on a first-in, first-out basis, and in ensuring that lawful permanent residence status is not granted to individuals whose permanent residence in the United States would raise national security concerns. Moreover, the D.C. Circuit has declined to intervene in agency delay cases when "a judicial order putting the petitioner at the head of the queue would simply move all others back one space and produce no net gain." <u>Mashpee Wampanoag Tribal Council, Inc. v. Norton</u>, 336 F.3d 1094, 1100 (D.C. Cir. 2003). Giving Plaintiffs' applications precedence over others' presents exactly that type of situation.

Finally, Defendants move in the alternative to transfer this case to the United States District Court for the Eastern District of Virginia. Plaintiffs reside in the Eastern District of Virginia, and the USCIS Washington Field Office is located in that district. The only nexus between this District and the case is the fact that the agency heads named as defendants have offices in D.C. However, most of the events at issue in this complaint - namely, the processing and adjudication of Plaintiffs' applications - involve adjudicative actions that have been and will be taken by USCIS staff at the Washington Field Office in Fairfax, Virginia. Accordingly, the

Eastern District of Virginia is a more appropriate forum for this case than this Court, and the interests of justice support transfer.

**BACKGROUND**

**A.     Statutory and Regulatory Background**

1.     <u>Adjustments of Status and Background Investigations</u>

The Immigration and Nationality Act permits the Attorney General "in his discretion and under such regulations as he may prescribe," to adjust the status of an alien "to that of an alien lawfully admitted for permanent residence."  8 U.S.C. § 1255(a).  Aliens that seek such adjustments of status file applications referred to as an "I-485."  The procedures for admitted aliens to apply for adjustment of status are set forth at 8 C.F.R. part 245.

USCIS processes adjustment applications in chronological order based on the date of receipt.  Neither the statute nor the regulations establish a time frame in which adjudication must occur.  The applicant must show that (s)he is not inadmissible to the United States under any statutory ground of inadmissibility set forth at section 212(a) of the Immigration and Nationality Act, 8 U.S.C. § 1182(a), including health-related, criminal, terrorist, and other grounds.  <u>See</u> 8 U.S.C. § 1255(a)(2).  An alien seeking adjustment of status bears at all times the burden of persuading the Attorney General to exercise his discretion in the alien's favor.  <u>See</u> <u>Randall v. Meese</u>, 854 F.2d 472, 474 (D.C. Cir. 1988); <u>Jain v. Immigration and Naturalization Service</u>, 612 F.2d 683, 687 (2d Cir. 1979); <u>see</u> <u>generally</u> <u>Elkins v. Moreno</u>, 435 U.S. 647, 667 (1978) ("... adjustment of status is a matter of grace, not right ...").

Before a decision is rendered on an alien's I-485 application for adjustment of status, USCIS requests that the FBI conduct a national security screening.  <u>See</u> Declaration of Susan P.

3

Dibbins, ¶ 8 (Exh. 1) ("Dibbins Decl.").  These checks currently include: (a) an FBI fingerprint check; (b) a check against the Interagency Border Inspection System (IBIS), which is managed by the Department of Homeland Security and contains records and "watch list" information from more than twenty law enforcement and intelligence agencies; and (c) an FBI name check.  Id. ¶ 1; see also 8 U.S.C. § 1105(a) (authorizing "direct and continuous liaison" with the Directors of the FBI and CIA to obtain and exchange information for use in enforcing the INA and in the interest of the internal and border security of the United States).

These security checks sometimes raise significant derogatory information which affect an applicant's eligibility for an immigration benefit.  See Dibbins Decl. ¶ 2.  In those cases, USCIS must conduct further inquiry to resolve any outstanding issues, and in some cases may initiate proceedings to remove the alien from the United States.  Id. ¶ 3.  USCIS cannot complete its adjudication of a request for permanent residence until all security checks have been completed, and until any and all issues that arise from those checks have been resolved.  Id. ¶ 5.

Because of heightened national security concerns, a review of the background check procedures employed by USCIS was conducted in November 2002.  See Decl. of Michael A. Cannon, ¶ 23 (Exh. 2) ("Cannon Decl.").  It was determined that more detailed, in-depth clearance procedures were required in order to better protect the people and the interests of the United States.  See id.  The name check clearance performed by the FBI was one of the procedures that needed revision.  See id.  Prior to November 2002, only those "main" files that could be positively identified with an individual were considered responsive.  See id.  The FBI subsequently altered its search criteria because the risk of missing a match to possible derogatory record(s) was too great.  See id.  Therefore, the search criteria were expanded to access reference

files in addition to the main files.  See id.  From a processing standpoint, this change meant the FBI would have to review many more files for each individual.  See id.

In December 2002 and January 2003, USCIS resubmitted 2.7 million name check requests to the FBI in addition to the regular submissions.  See id. ¶ 24.  Over 440,000 of the responses to the 2.7 million resubmitted name check requests indicated that the FBI may have information relating to the subjects.  See id.  The FBI's processing of the more than 440,000 resubmissions that require follow-up to resolve the name checks has delayed the processing of the regular submissions from USCIS, although fewer than 6,300 of those re-submitted name check requests remain pending.  See id. ¶ 25.  Several other factors contribute to potential delays in processing background checks for an applicant, including the volume of incoming name check requests, the number of hits on a name when it is reviewed, the processing of common names, and the accessibility of the FBI records needed for review.  See id. ¶¶ 26-29.  The FBI generally processes name check requests on a first-in, first-out basis at each stage of its investigation (unless USCIS specifically requests that a particular name check be expedited or the name checks have been prioritized as "single hit" name checks).  See id. ¶¶ 18-20.

2. <u>Judicial Review of Immigration-Related Decisions</u>

In 1996, Congress passed legislation to reduce, and in some cases eliminate, judicial review of certain immigration-related decisions made by the former Immigration and Naturalization Service ("INS").  See Sec. 306, Illegal Immigration Reform and Immigration Responsibility Act of 1996 (IIRIRA), Pub. L. 104-208, 110 Stat. 3009 (September 30, 1996).  In particular, 8 U.S.C. § 1252(a)(2)(B)(ii), divests courts of jurisdiction to review any "decision or

action of the Attorney General the authority for which is specified … to be in the discretion of the Attorney General, other than the granting of [asylum]."

Because some courts, contrary to Congress' desires, found that this jurisdiction-stripping bar applied only to discretionary decisions made during removal (deportation) proceedings, on May 11, 2005, Congress amended Section 1252(a)(2)(B)(ii) to clarify that its proscription against judicial review applies regardless of whether the discretionary judgment, decision or action is made in removal proceedings.  See Section 101(f), Real ID Act of 2005, Pub. L. 109-13, Div. B, 119 Stat. 231; see also House Conference Report 109-72 at 170 (May 3, 2005). The REAL ID Act also added references to the Secretary of Homeland Security consistent with the reorganization of INS (under the Attorney General and U.S. Department of Justice) into USCIS (under the Department of Homeland Security).  Id.  After passage of the Real ID Act, the statute reads as follows:

> (B) Denials of discretionary relief
>
> Notwithstanding any other provision of law (statutory or nonstatutory) . . . and regardless of whether the judgment, decision, or action is made in removal proceedings, no court shall have jurisdiction to review-
> (i) any judgment regarding the granting of relief under section 1182(h), 1182(I), 1229b, 1229c, or 1255 of this title, or
> (ii) any other decision or action of the Attorney General or the Secretary of Homeland Security the authority for which is specified under this subchapter to be in the discretion of the Attorney General or the Secretary of Homeland Security, other than the granting of relief under section 1158(a) of this title.

8 U.S.C. 1252(a)(2)(B).

## B.    Plaintiffs' Applications

Plaintiff Omar Aqel, a national of Morocco, filed a Form I-485 application to register permanent residence or adjust status on March 19, 2003.  See Compl. ¶ 6; Dibbins Decl. ¶6.  His

spouse, Plaintiff Ishan Taliah Abdur-Rahman is a U.S. citizen.  Compl. ¶¶ 6, 10; Dibbins Decl. ¶ 6.  She filed an I-130 petition for alien relative on Aqel's behalf on the same day.  Id.  Those applications were filed with USCIS's Orlando Field Office.  Compl. at ¶ 10; Dibbins Decl. at ¶ 6.    At some time after the filing of their joint I-130/I-485 packet in Orlando, Florida, Plaintiff moved to Randallstown, Maryland.  Dibbins Decl. at ¶ 7.  This city is within the jurisdiction of the Baltimore District Office of U.S. Citizenship and Immigration Services, and the applications were received into the Baltimore office on or around August 29, 2005.  Id.  Plaintiff Aqel attended a fingerprint appointment on September 2, 2005.  Compl. at ¶ 10.  An interview was conducted at the Baltimore District Office on November 10, 2005.  Dibbins Decl. at ¶ 7; Compl. ¶ 10.  Before a decision could be completed the applicant moved once again, this time to Broadlands, Virginia, within the jurisdiction of the Washington Field Office, located in Fairfax, Virginia.  Dibbins Decl. at ¶ 7.  A new interview concerning the form I-130 and the form I-485 has been scheduled at the Washington Field office for January 18, 2008.  Id.

Shortly after Plaintiffs' application and petition were filed, USCIS requested that the FBI conduct background checks in connection with Aqel's Form I-485.  See Dibbins Decl. ¶ 8; Cannon Decl. ¶ 41.  The background check for Aqel is not yet complete.  See Cannon Decl. ¶ 41. The FBI will transfer the results of the background check to USCIS after the investigation is complete.  See id.

FBI fingerprint checks of the applicant were submitted to the FBI on September 21, 2005.  Dibbins Decl. ¶ 9.  USCIS received the results of that fingerprint check from the FBI on September 26, 2005.  Id.  The FBI fingerprint checks must be completed for each alien applicant for an immigration benefit, as required by public law 105-119.  Id.  Pursuant to current USCIS

policy, fingerprints so taken are valid for a period of 15 months after processing by the FBI.  Id.

Therefore, the first fingerprints are now expired.  Id.  Therefore the Washington Field Office of

USCIS scheduled a new fingerprint appointment for December 20, 2007, but no results have

been received from that appointment.  Id.  If no fingerprint results are received before the

interview on January 18, 2008, another fingerprint appointment will be scheduled for the

applicant.  Id.

IBIS checks were initiated on the applicant on November 9, 2005, and again on June 2,

2006, and are expired.  Dibbins Decl. ¶ 10.  A new IBIS check will be necessary.  Id.

Plaintiffs initiated this action with a mandamus complaint filed on October 2, 2007.

Plaintiffs ask the Court to order Defendants to complete adjudication of their I-130 petition and

I-485 application within thirty days.  Compl., Prayer ¶ a.

## STANDARD OF REVIEW

Defendants move for dismissal under Rule 12(b)(1) because the Court lacks subject

matter jurisdiction to review Plaintiffs' claims.  See Fed. R. Civ. P. 12(b)(1).  When reviewing a

12(b)(1) motion to dismiss, "the court must accept the complaint's well-pled factual allegations

as true and draw all reasonable inferences in the plaintiff's favor."  Thompson v. Capitol Police

Bd., 120 F. Supp.2d 78, 81 (D.D.C. 2000) (citations omitted); see also Vanover v. Hantman, 77

F. Supp.2d 91, 98 (D.D.C. 1999).  "The court is not required, however, to accept inferences

unsupported by the facts alleged or legal conclusions that are cast as factual allegations."  Rann

v. Chao, 154 F. Supp. 2d 61, 64 (D.D.C. 2001), aff'd, 346 F.3d 192 (D.C. Cir. 2003).  In

addition, plaintiffs bear the burden of persuasion, and must establish subject-matter jurisdiction

"by a preponderance of the evidence."  Thompson, 120 F. Supp.2d at 81; Vanover, 77 F. Supp.2d

8

at 98. To determine the existence of jurisdiction, a court may look beyond the allegations of the complaint, consider affidavits and other extrinsic information, and ultimately weigh the conflicting evidence. See Herbert v. Nat'l Academy of Sciences, 974 F.2d 192, 197 (D.C. Cir. 1992); Rann, 154 F. Supp. at 64.

Defendants also move for dismissal under Rule 12(b)(6), for failure to state a claim upon which relief can be granted. Rule 12(b)(6) requires dismissal if a plaintiff fails to plead "enough facts to state a claim for relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 127 S.Ct. 1955, 1974 (2007) (abrogating prior standard which required the moving party to show that plaintiff can prove no set of facts in support of its claim which would entitle it to relief). The Court must resolve all factual doubts in favor of the plaintiff, and allow the plaintiff the benefit of all inferences. See EEOC v. St. Francis Xavier Parochial Sch., 117 F.3d 621, 624 (D.C. Cir. 1997).

## **ARGUMENT**

## I.    **THE COURT LACKS SUBJECT MATTER JURISDICTION TO REVIEW PLAINTIFFS' CLAIMS.**

"Federal courts are courts of limited jurisdiction . . . [and] possess only that power authorized by Constitution and statute." Kokkonen v. Guardian Life Ins. Co., 511 U.S. 375, 377 (1994); see also Shaffer v. Veneman, 325 F.3d 370, 372 (D.C. Cir. 2003) (noting that district courts "have only such jurisdiction as the Constitution and the Congress grant them"). The statutes cited in the complaint do not establish a statutory basis for the Court to exercise jurisdiction over this case. The Court lacks jurisdiction to review Plaintiffs' challenge to USCIS's processing of their I-130 petition and I-485 application because Section 1252 of the INA precludes judicial review of USCIS's "judgments" on applications for adjustment of status,

and of numerous other discretionary decisions and actions involving immigration-related applications and proceedings. 8 U.S.C. § 1252(a)(2)(B). That provision applies "notwithstanding any other provision of law," thereby trumping any alternative source of jurisdiction. Id. The FBI has complete discretion to determine the scope and pace of its national security investigations. Accordingly neither the Administrative Procedures Act ("APA") nor the Mandamus Act permits this Court to review that discretionary process. USCIS has equally broad discretion to determine the pace and manner of adjudicating adjustment of status applications. Accordingly, there would be no APA or mandamus jurisdiction over Plaintiffs' challenge to that process even if the INA did not preempt other sources of jurisdiction.

**A.**      **8 U.S.C. § 1252(a)(2)(B) Divests This Court of Jurisdiction Over Plaintiffs' Challenge to USCIS's Adjudication of Their Applications.**

Section 1252(a) of the INA expressly precludes judicial review of adjustment of status applications and other discretionary decisions. As noted supra, Section 1252(a)(2)(B), provides that "no court shall have jurisdiction to review:"

> (i)      any judgment regarding the granting of relief under section 1182(h), 1182(i), 1229b, 1229c, or 1255 of this title, or
> (ii)      any other decision or action of the Attorney General or the Secretary of Homeland Security the authority for which is specified under this title to be in the discretion of the Attorney General or the Secretary of Homeland Security, . . . .

8 U.S.C. § 1252(a)(2)(B) (emphasis added). In seeking to compel the adjudication of an adjustment of status application under 8 U.S.C. § 1255, Plaintiffs' claims fall squarely within the plain meaning of each of these terms.

First, the authority to adjudicate adjustment of status applications arises under 8 U.S.C.

§ 1255(a), and subsection (i) expressly bars judicial review of "any judgment regarding the granting" of such an application.  8 U.S.C. §§ 1252(a)(2)(B)(i), 1255(a).  It follows that the Court cannot review USCIS's judgment that its adjudication of Plaintiffs' application cannot be completed until the FBI has completed processing the background checks.

Second, Section 1252(a)(2)(B)(ii) also divests this Court of subject matter jurisdiction over Plaintiffs' claims because the adjudication of an adjustment of status application and related petition for alien relative is a discretionary action and decision.  "[T]his subchapter" refers to Subchapter II of Chapter 12 of Title 8 of the U.S. Code, which is composed of 8 U.S.C. §§ 1151 through 1378.  Section 1255(a), which grants the Attorney General discretionary authority to adjudicate adjustment of status applications, is thus part of Subchapter II.  The "authority" for adjudicating adjustment of status applications is expressly "in the discretion of the Attorney General," pursuant to Section 1255(a).  <u>See</u> 8 U.S.C. § 1255(a) (providing that an alien's status "*may* be adjusted by the Attorney General, *in his discretion* and under such regulations as he may prescribe."  <u>Id.</u> (emphasis added)).  The statute provides no time frame for the adjudication of I-485 applications, and gives the Attorney General complete discretion to prescribe any appropriate regulations.  <u>See id.</u>  The statute also imposes no limits on adjudication of petitions for alien relative filed with adjustment applications.  The Attorney General's discretion over the process of adjudicating an I-485 and I-130 necessarily extends to the assessment of when, whether, and how to grant those applications.

That statutory language has led numerous courts to conclude that Section 1252(a)(2)(B)(ii) bars judicial review of claims challenging aspects of the I-485 adjudicative process.  <u>See, e.g.</u>, "); <u>Luo v. Keisler</u>, ___ F. Supp. 2d ____, 2007 WL 3357241 (D.D.C. Nov. 14,

11

2007) (discussing Section 1252(a)(2)(B) and granting motion to dismiss action to compel

adjudication of plaintiffs' I-485s); Orlov v. Howard, ___F.Supp.2d____, 2007 WL 4293490

(D.D.C. Dec. 10, 2007) ("Therefore, because the adjustment process, including the pace of

processing applications, falls within the discretion of USCIS, and because the pace of processing

applications, including completing security checks, constitutes an "action" under the plain

meaning of the word, judicial review of plaintiff's claim is precluded by § 1252(a)(2)(B)(ii).");

Sun v. Gonzales, 1:07-cv-00504 (JDB), Order, December 10, 2007 (Pacer Dkt. 12) at 3

("Because 8 U.S.C. § 1252(a)(2)(B)(ii) divests federal courts of jurisdiction to review a

discretionary decision or action of USCIS, and an 'action' includes any discretionary act or series

of acts within the adjustment of status process (including the pace of completing various security

checks), this Court lacks jurisdiction over plaintiff's petition."); Grinberg v. Swacina, 2007 WL

840109 (S.D.Fla. March 20, 2007) (discussing Section 1252(a)(2)(B) and granting motion to

dismiss); Safadi v. Howard, 466 F. Supp. 2d 696 (E.D. Va. 2006) (same); Sharkey v. Ganter,

2006 WL 177156 (S.D.N.Y.)(same); Dinsey v. Department of Homeland Security, No.

03-10081, 2004 WL 1698630, at * 4 (S.D.N.Y. 2004) (finding no jurisdiction over action to

compel USCIS to adjudicate adjustment of status application because the INA "expressly places

the adjustment of immigration status within the discretion of the Attorney General); see

generally Zhu v. Gonzales, 411 F.3d 292, 294-96 (D.C. Cir. 2005) (concluding 1252(a)

precludes judicial review of Attorney General's discretionary decision to  require party to obtain

labor certification prior to obtaining a work visa); Mahaveer, Inc. v. Bushey, No. 04-1275, 2006

WL 1716723, at *3-*4 (D.D.C. June 19, 2006) (concluding 1252(a) bars review of discretionary

denial of visa).

Defendants recognize that federal district courts are split on this issue, and that some judges have concluded that they have jurisdiction to review the reasonableness of any delays in completing adjudication of an I-485 petition.  Compare, e.g., Liu v. Novak, No. 07-263, ___ F. Supp. 2d ___, 2007 WL 2460425 (D.D.C. Aug. 30, 2007) (exercising jurisdiction over claim alleging unreasonable delay in resolving adjustment of status application); Alsharqawi v. Gonzales, No. 06-1165, 2007 WL 1346667 (N.D. Tex. Mar. 14, 2007) (same) with Luo, 2007 WL 3357241, at *1-*2 (dismissing claim alleging unreasonable delay in resolving adjustment of status application for lack of jurisdiction); Orlov, 2007 WL 4293490, at *7 ("judicial review of plaintiff's claim of delay in the adjustment process is precluded by § 1252(a)(2)(B)(ii)"); Sun, 1:07-cv-00504 (JDB), Order, December 10, 2007 (Pacer Dkt. 12) at 3 ("this Court lacks jurisdiction to review the ongoing pace at which plaintiff's application [Form I-485] is being adjudicated."); Elzer v. Mueller, No. 07-01666, 2007 WL 1221195 (E.D. Pa. Apr. 23, 2007) (dismissing challenge for lack or jurisdiction); Grinberg, 478 F. Supp. 2d at 1352 (same). However, the D.C. Circuit has not yet addressed the issue, and the other courts' rulings are not binding on this Court.  As the foregoing discussion makes clear, the INA's jurisdiction-stripping provisions are best read as precluding judicial review of Plaintiff Aqel's claims concerning the adjustment of status application. "[T]he determination that § 1252(a)(2)(B)(ii) precludes judicial review over plaintiff's claim is further supported by the general rule that courts should refrain from interfering with matters of immigration and national security."  Orlov, 2007 WL 4293490, at *6.

**B.**     **No Other Statute Gives the Court Jurisdiction to Review Plaintiffs'**
**Challenge to the Pace of the Adjudication of Their I-130 and I-485**
**Applications.**

Even if some other statute conferred jurisdiction to review Plaintiffs' request for

immediate adjudication of their applications, the INA would foreclose the exercise of that

jurisdiction because it applies "notwithstanding any other provision of law (statutory or

nonstatutory)." 8 U.S.C. § 1252(a)(2)(A);  see Luo, 2007 WL 3357241, at * 2 n. 4 (citing INA

and noting that it specifically precludes judicial review "notwithstanding any other provision of

law"); Orlov, 2007 WL 4293490, at *4 ("under 8 U.S.C. § 1252(a)(2)(B)(ii) Congress clearly

intended to preclude judicial review in this situation[delays in the adjustment process]"); Sun,

1:07-cv-00504 (JDB) at 3 (citing INA and noting that it "divests federal courts of jurisdiction to

review a discretionary decision or action of USCIS");  Danilov v. Aguirre, 370 F. Supp. 2d 441,

445 (E.D. Va. 2005) (Ellis, J.) ("[I]t is well settled that general grants of jurisdiction may not be

relied upon to expand a very specific statute that either grants or limits jurisdiction.").  However

there is no alternative source of jurisdiction in this case.  The Mandamus Act does not apply

because the process of adjudicating Plaintiffs' applications involves discretionary acts and

decisions.  The Administrative Procedure Act is inapplicable for similar reasons.

**1.**     **The Mandamus Act Does Not Confer Jurisdiction Because The**
**Adjudication of Plaintiffs' Applications Is A Discretionary Process.**

The Mandamus Act would not confer subject matter jurisdiction even if the jurisdiction-

stripping provisions of INA § 242 did not apply.  That statute gives district courts "original

jurisdiction of any action in the nature of mandamus to compel an officer or employee of the

United States or any agency thereof to perform a duty owed to the plaintiff."  28 U.S.C. § 1361.

The writ of mandamus is "a drastic and extraordinary remedy reserved for really extraordinary

14

causes." <u>Cheney v. United States District Court</u>, 542 U.S. 367, 380 (2004) (internal quotations and citation omitted); <u>accord</u> <u>Allied Chemical Corp. v. Daiflon, Inc.</u>, 449 U.S. 33, 34 (1980). District courts may issue a writ of mandamus only if three elements are met: "(1) the plaintiff has a clear right to relief; (2) the defendant has a clear duty to act; and (3) there is no other adequate remedy available to the plaintiff." <u>In re Medicare Reimbursement Litigation</u>, 414 F.3d 7, 10 (D.C. Cir. 2005); <u>see</u> <u>also</u> <u>Heckler v. Ringer</u>, 466 U.S. 602, 616 (1984) (noting that defendant must owe plaintiff "a clear nondiscretionary duty" and that all other remedies must be exhausted). Even when those factors are present, "a court may grant relief only when it finds 'compelling equitable grounds.'" <u>In re Medicare Reimbursement Litigation</u>, 414 F.3d at 10.

Here, Plaintiffs lack a clear right to immediate adjudication, and Defendants have no clear mandatory or ministerial obligation to adjudicate the applications or complete background checks within a particular time frame. <u>See</u> <u>Luo</u>, 2007 WL 3357241, at *2 n.4; <u>Orlov</u>, 2007 WL 4293490, at *8; <u>Sun</u>, 1:07-cv-00504 (JDB) at 4; <u>Safadi v. Howard</u>, 466 F.Supp.2d at 700; <u>Grinberg</u>, 478 F. Supp. 2d at 1354. The decision whether to grant or deny Aqel's adjustment application is plainly discretionary by statute. <u>See</u> 8 U.S.C. § 1255(a). Surely, that discretion permits USCIS to enforce a background check requirement thereby ensuring that immigration benefits are not granted to an alien ineligible for the benefit due to fraud, criminal convictions, or national security matters. There are no statutory provisions or regulations that mandate the adjudication of adjustment applications or related petitions for alien relative within a particular time frame. Consequently, USCIS has no clear, mandatory duty to finish adjudicating Plaintiffs' applications prior to completion of background checks, or by a prescribed deadline. Likewise, Plaintiffs can point to no clear and indisputable right to have the background checks completed

15

within a specific time frame, and the FBI has no statutory or regulatory duty to limit background examinations to a fixed period of time.  See Shalabi v. Gonzales, No. 06-866, 2006 WL 3032413, at * 5 (E.D. Mo. Oct. 23, 2006) (denying plaintiff's request that the court compel that plaintiff's background check be expedited).  Those factors have led numerous district courts to find that mandamus relief is unavailable in cases such as this.  See, e.g., Orlov, 2007 WL 4293490, at *8; Sun, 1:07-cv-00504 (JDB) at 4; Li, 482 F. Supp. 2d at 1177; Grinberg, 478 F. Supp. 2d at 1354; Safadi, 466 F. Supp.2d at 700; Saleh v. Ridge, 367 F. Supp. 2d 508, 511 (S.D.N.Y. 2005); Karan v. McElroy, No. 02 Civ. 6678 (JGK), 2003 WL 21209769, at *1 (S.D.N.Y. May 23, 2003); Zheng v. Reno, 166 F. Supp.2d 875, 880 81 (S.D.N.Y. 2001); Sadowski v. INS, 107 F.Supp.2d 451, 453 (S.D.N.Y. 2000).  This Court should do the same.

> **2.      The Administrative Procedures Act Does Not Permit This Court to Review Plaintiff Aqel's Challenge to USCIS's Processing of Their Applications.**

Plaintiffs also have no right to judicial review under the APA.  Although the APA is not an independent source of subject matter jurisdiction, it operates in tandem with federal question jurisdiction under 28 U.S.C. § 1331 to permit courts to review challenges to certain agency actions.  See Califano v. Sanders, 430 U.S. 99, 107 (1977); Grinberg, 478 F. Supp. 2d at 1355; Galluci v. Chao, 374 F. Supp. 2d 121, 128 (D.D.C. 2005).  However, the APA expressly precludes judicial review of agency actions in two circumstances: (1) if another statute "preclude[s] judicial review;" and (2) when "agency action is committed to agency discretion by law."  5 U.S.C. § 701(a)(2); Brock v. Pierce County, 476 U.S. 253, 260 n.7 (1986).  Both factors prevent Plaintiffs from using the APA as a means of challenging USCIS's processing of their applications and/or the FBI's processing of  Aqel's background checks.

16

First, as discussed above, the INA bars judicial review of challenges to the adjustment of status adjudication process.  Accordingly, Section 701(a) of the APA, which "withdraws [an APA] cause of action" to the extent another statute "precludes judicial review," prevents Plaintiff from raising an APA challenge concerning the adjudication of his adjustment of status application.  Block v. Community Nutrition Inst., 467 U.S. 340, 345 (1984); see 5 U.S.C. § 701(a); Beyond Pesticides v. Whitman, 360 F. Supp. 2d 69, 71 (D.D.C. 2004); see generally Bruno v. Albright, 197 F.3d 1153, 1161-62 (D.C. Cir. 1999) (concluding that "the immigration laws preclude judicial review of consular visa decisions" and therefore bar APA challenges to a visa decision).  Section 702 forecloses judicial review of Plaintiffs' challenge to the adjudication of their applications for the same reason, as it provides that "nothing herein affects other limitations on judicial review . . . or confers authority to grant relief if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought."  5 U.S.C. § 702.

Second, the APA bars judicial review of all of Plaintiffs' claims because the USCIS and FBI actions Plaintiffs have challenged are discretionary.  The APA generally permits challenges to "agency action unlawfully withheld or unreasonably delayed."  5 U.S.C. § 706(1); see also 5 U.S.C. § 555(b) (indicating that agencies should conclude matters "within a reasonable time").  However, such claims are unreviewable by the courts if the relevant agency action is "committed to agency discretion by law."  Id. § 701(a)(2); see also Orlov, 2007 WL 4293490, at *8 (quoting Norton v. S. Utah Wilderness Alliance, 542 U.S. 55, 66 (2004) ("a claim under § 706(1) can proceed only where a plaintiff asserts that an agency failed to take a discrete agency action that it is required to take.").  In Heckler v. Chaney, the Supreme Court interpreted 5 U.S.C. § 701(a)(2) to mean that "review is not to be had if the statute is drawn so that the court would have no

17

meaningful standard against which to judge the agency's exercise of discretion." 470 U.S. 821, 830 (1985). As the Court explained, "if no judicially manageable standards are available for judging how and when an agency should exercise its discretion, then it is impossible to evaluate agency action for 'abuse of discretion.'" Id.; see also Steenholdt v. Federal Aviation Admin., 314 F.3d 633, (D.C. Cir. 2003) (articulating same standard). "The principal purpose of the APA limitations . . . and of the traditional limitations upon mandamus from which they were derived-is to protect agencies from undue judicial interference with their lawful discretion . . . ." Norton v. So. Utah Wilderness Alliance, 542 U.S. 55, 66 (2004).

Plaintiffs have no APA cause of action for "unreasonable agency delay" against USCIS because the timing of USCIS's adjudication of their applications is expressly committed to agency discretion, as are all other aspects of processing the applications. Section 1255(a) permits the Attorney General to adjust an alien's status "*in his discretion* and under such regulations as he may prescribe." 8 U.S.C. § 1255(a) (emphasis added). That is the type of "plenary" grant of discretion which renders agency actions unreviewable under the APA. Secretary of Labor v. Twentymile Coal Co., 456 F.3d 151, 157 (D.C. Cir. 2006). No statutory or regulatory provisions provide a "meaningful standard" against which to measure USCIS's process of adjudicating such an application. Heckler, 470 U.S. at 830. Rather, the agency maintains complete discretion to determine "how and when" to adjudicate the application and any related I-130 which seeks the same benefit. See id. In contrast with certain other immigration provisions, e.g., 8 U.S.C. § 1447(b), the statute and regulations governing Plaintiff Aqel's adjustment of status application provide no time frame for when such an application must be adjudicated. See Orlov, 2007 WL

4293490, at *8 ("[T]here are no statutory guidelines compelling USCIS to adjudicate adjustment

of status applications within a certain period of time."); <u>Zheng</u>, 166 F.Supp.2d at 879 ("[T]here is

no requirement that the application be decided within a specific period of time[.]").

Consequently, there is no standard against which the Court can measure whether USCIS has

acted "within a reasonable time," 5 U.S.C. § 555(b), or "unreasonably delayed" adjudication, <u>id.</u>

§ 706(1). The fact that the adjudicatory process is committed to agency discretion by law

renders claims relating to alleged delays in the adjudication of an adjustment of status

application and related I-130 petition unreviewable under the APA. <u>See</u> <u>Luo</u>, 2007 WL

3357241, at *2  n.4; <u>Orlov</u>, 2007 WL 4293490, at *8; <u>Sun</u>, 1:07-cv-00504 (JDB) at 4; <u>Safadi</u>,

466 F.Supp.2d at 700; <u>Zheng</u>, 166 F.Supp.2d at 878 89; <u>Karan</u>, 2003 WL 21209769, at *1

("[B]ecause decisions regarding the plaintiff's immigration status are committed to the discretion

of the INS, this Court lacks the authority under . . . the APA to grant the relief the plaintiff

seeks."); <u>see</u> <u>also</u> <u>Rahman v. McElroy</u>, 884 F.Supp. 782, 787 88 (S.D.N.Y. 1995). In addition,

at least two Supreme Court cases suggest that the presence of a specified time period triggers

courts' ability to compel agency action that is "unreasonably delayed" under § 706(1). <u>See</u>

<u>Norton</u>, 542 U.S. at 65 ("Thus, when an agency is compelled by law to act within a certain time

period . . . a court can compel the agency to act . . . ."); <u>Brock</u>, 476 U.S. at 260 n.7 (finding that

because "the statutory command that the Secretary 'shall' act within 120 days does not commit

such action to the Secretary's discretion, . . . [t]he court would have the authority to 'compel

agency action unlawfully withheld or unreasonably delayed,' § 706(1)").

     Without any mandatory time frame to adjudicate Plaintiffs' claim that USCIS has

"unreasonably delayed" adjudication of the applications and the processing of Aqel's background

checks, this Court would have to create a temporal standard out of whole cloth. This is a perilous task given the national security considerations that permeate USCIS's adjudicative process and the obvious national security interest in through and complete FBI background checks. See Orlov 2007 WL 4293490, at *8 (declining "to impose an arbitrary deadline on USCIS for the completion of such investigations" because "[i]nterference by this Court . . . could have national security implications").  It is a well established proposition that judicial review of immigration matters is narrowly circumscribed, and that control over immigration is largely entrusted to the political branches of the government. See Valenzuela Bernal, 458 U.S. at 864; Diaz, 426 U.S. at 81 ("Since decisions in these matters may implicate our relations with foreign powers, and since a wide variety of classifications must be defined in the light of changing political and economic circumstances, such decisions are frequently of a character more appropriate to either the Legislature or the Executive than to the Judiciary."). Moreover, as other courts have cautioned, in "'matters solely within the INS's discretion[,] . . . aside from our powerlessness to intervene, the judicial creation of such a duty would have the potential for mischievous interference with the functioning of already overburdened administrative agencies.'" Rahman, 884 F. Supp. at 787 (quoting Wan Shih Hsieh v. Kiley, 569 F.2d 1179, 1182 (2d Cir. 1978)); see also Heckler, 470 U.S. at 831 82 (noting that "[t]he agency is far better equipped than the courts to deal with the many variables involved in the proper ordering of its priorities"); Luo, 2007 WL 3357241, at *2 (concluding judicial intervention would be "inappropriate" given national security concerns).  Those principles counsel against the imposition of a judicially-created standard to gauge how long USCIS may wait for assurance that the

background checks have identified no national security reasons that would merit denial of an

applicant's adjustment application, or how much time the FBI may devote to its investigations.

## II.    IF THE COURT HAD SUBJECT MATTER JURISDICTION, PLAINTIFFS' CLAIMS  WOULD BE SUBJECT TO DISMISSAL UNDER RULE 12(b)(6).

Even if the Mandamus Act or  the APA could be construed as permitting this Court to

review the reasonableness of the delay in completing the processing of Plaintiffs' I-130 petition

and I-485 adjustment application, Rule 12(b)(6) would require dismissal of any such claim.  The

D.C. Circuit has identified six factors courts should consider when reviewing claims that allege

unreasonable agency delay:

> (1) the time agencies take to make decisions must be governed by a "rule of
> reason"; (2) where Congress has provided a timetable or other indication of the
> speed with which it expects the agency to proceed in the enabling statute, that
> statutory scheme may supply content for this rule of reason; (3) delays that might
> be reasonable in the sphere of economic regulation are less tolerable when human
> health and welfare are at stake; (4) the court should consider the effect of
> expediting delayed action on agency activities of a higher or competing priority;
> (5) the court should also take into account the nature and extent of the interests
> prejudiced by delay; and (6) the court need not "find any impropriety lurking
> behind agency lassitude in order to hold that agency action is 'unreasonably
> delayed.'"

In re United Mine Workers of America Inter. Union, 190 F.3d 545, 547 (D.C. Cir. 1999)

(quoting Telecommunications Research & Action Ctr. v. FCC, 750 F.2d 70, 75-77, 79 (D.C. Cir.

1984) ("TRAC").  Where, as here, Congress has declined to establish a specific timetable for

agency action, the Court is "not free to ignore that judgment and rewrite the statute to include a

specific timetable."  In re American Fed. of Govt. Employees AFL-CIO, 837 F.2d 503, 506

(D.C. Cir. 1988).  The D.C. Circuit also has emphasized the importance of considering the

agency's competing priorities, noting that agencies should be given "great latitude in determining their agendas." In re Monroe Comms. Corp., 840 F.2d 942, 946 (D.C. Cir. 1988).

The complaint does not allege facts sufficient to support Plaintiffs' claim that USCIS has unreasonably delayed processing their applications.  As noted, Congress has established no timetable for processing adjustment applications or national security investigations.  Further, the competing interests at issue in this case militate against granting Plaintiffs the relief they seek. The D.C. Circuit has "declined to grant relief, even when all the other factors considered in TRAC favored it, where a judicial order putting the petitioner at the head of the queue would simply move all others back one space and produce no net gain." Mashpee Wampanoag Tribal Council, Inc. v. Norton, 336 F.3d 1094, 1100 (D.C. Cir. 2003) (citing In re Barr Labs., Inc., 930 F.2d 72, 75 (D.C. Cir. 1991)).  Yet that is precisely what Plaintiffs ask this Court to do. Defendants and the numerous individuals with pending adjustment applications have a strong interest in processing the applications in an orderly fashion and ensuring that all applicants are treated the same.  See Cannon Decl.  ¶ 26 (noting that as of the end of Fiscal Year 2006 there were over 364,000 pending USCIS name check requests).  Allowing any alien that files a lawsuit to leapfrog to the head of the queue would be contrary to those interests, and potentially would lead applicants with pending background checks to flood the federal courts with mandamus actions in order to obtain that advantage.  As the Eastern District of Virginia has recognized,

> to grant relief in this case would set a dangerous precedent, sending a clear signal that more litigious applicants are more likely to be moved to the top of the proverbial pile over other applicants that have waited even longer.  Such a situation hardly optimizes resources, and serves only the individual at the detriment to the group.

Dmitrenko v. Chertoff, No. 07-82, 2007 WL 1303009, at * 1 (E.D. Va. Apr. 30, 2007); see also id. at n. 1 ("To grant relief to today's petitioners, compelling adjudication of their application over persons that have waited even longer, would be far from equitable.").  While Plaintiffs may desire immediate adjudication of their applications, they have no entitlement to that relief.

Finally, Defendants' obligation to protect national security is another "competing interest" that makes any delay reasonable.  Background checks serve an important law-enforcement and public safety purpose.  See Li v. Chertoff, 482 F. Supp. 2d 1172, 1178 (S.D. Cal. 2007); Cannon Decl. ¶  4.  As Susan Dibbins has explained:

> It would be unconscionable and potentially risk the safety and security of the nation for USCIS to grant United States lawful permanent resident status to anyone without first ensuring that the government's law enforcement databases do not contain verified derogatory information about the alien.  With lawful permanent resident status, a person who is a risk to the public or the nation's security could obtain work in sensitive industries and travel on transportation carriers more easily.

Dibbins Decl. ¶ 5.  Accordingly, courts have found it reasonable for an adjustment application to remain pending for long periods of time when the delay is attributable to an ongoing security investigation.  See Zahani, 2006 WL 2246211, at *3 (noting "[c]ourts have routinely found delays caused by FBI background checks to be justifiable delays" and citing cases); Zheng v. INS, 933 F. Supp. 338, 341 (S.D.N.Y. 1996) (dismissing case pursuant to 12(b)(6) because delaying processing of application pending completion of background checks was not an unreasonable delay); Jabr v. Chertoff, No. 4:06cv00543, 2006 WL 3392504, at *2 (E.D. Mo. Nov. 21, 2006) (finding plaintiffs failed to state a claim for unreasonable agency delay although adjustment application had been pending for more than two years due to background checks).  For all the foregoing reasons, Plaintiffs have failed to state a claim for unreasonable delay in

adjudicating their I-130 and I-485 applications.

III.    IN THE ALTERNATIVE, THE COURT SHOULD TRANSFER THE CASE TO
        THE EASTERN DISTRICT OF VIRGINIA.

This case is governed by the general venue statute, 28 U.S.C. § 1391, which establishes

default rules for venue that apply to federal lawsuits where the underlying statutes do not specify

their own venue rules.  See 28 U.S.C. § 1391(a), (b), and (e) (each applying "except as otherwise

provided by law.").  Section 1391 identifies three possible bases for venue for claims against

federal government officials or agencies: (1) where a defendant "resides;" (2) the district where

"a substantial part of the events or omissions giving rise to the claim occurred;" or (3) where "the

plaintiff resides, if no real property is involved in the action."  28 U.S.C. § 1391(e).  Plaintiffs

appear to rely on the first prong of this test, and allege that venue is proper in this Court because

the agency heads named as Defendants have offices in the District of Columbia.  See Compl.¶ 5.

When a plaintiff bases its venue arguments solely on federal agency defendants' presence

in Washington D.C., the venue challenge should be examined  "very closely."  Cameron v.

Thornburgh, 983 F.2d 253, 256 (D.C. Cir. 1993).  That close scrutiny has led courts in this

District to invoke their transfer authority pursuant to 28 U.S.C. § 1404(a) and transfer cases to a

district with a closer nexus to the parties' dispute.  See, e.g., Cameron, 983 F.2d at 256 (ruling

Washington, D.C. was not the proper venue because the sole connection to Washington, D.C.

was the inclusion of the Director of the Federal Bureau of Prisons and the Attorney General in

their official capacities); Abusadeh v. Chertoff, 2007 WL 2111036, at *6-*9 (D.D.C. July 23,

2007) (transferring mandamus action seeking adjudication of naturalization application and

petition to replace alien card to Southern District of Texas because that was where the

application was being adjudicated); D.D.C. Oct. 25, 2007) (unpublished Order) (transferring

mandamus action concerning I-485 to the Southern District of Texas because that is where

25

plaintiff resided and the district in which the USCIS office with jurisdiction over their applications was located) (attached as Exh. 4 hereto); <u>Poliakova v. Gonzales</u>, No. 07- 1210 (D.D.C. Dec. 17, 2007) (Order attached hereto as Exh. 1) (transferring mandamus action concerning I-485 to Southern District of Florida for the same reason) ; <u>Rosales v. United States</u>, 477 F. Supp.2d 213, 215-17 (D.D.C. 2007) (transferring case against federal agency to district in which the challenged events took place); <u>Southern Utah Wilderness Alliance v. Norton</u>, 315 F. Supp.2d 82, 886-89 (D.D.C. 2005) (concluding environmental case should be transferred to Utah where D.C. officials only set general policies and did not make specific decisions being appealed); <u>Joyner v. District of Columbia</u>, 267 F. Supp.2d 15, 20 21 (D.D.C. 2003) (holding that the case's only connection to Washington, D.C. was the situs of named federal government defendants and transferring to a district with which the case had several connections). Otherwise, "[b]y naming high government officials as defendants, a plaintiff could bring suit here that properly should be pursued elsewhere." <u>Cameron</u>, 983 F.2d at 256.

The fact that some of the Defendants are high government officials who reside in the District of Columbia does not establish a sufficient connection to this District, and the Court should transfer this case to the Eastern District of Virginia. Section 1404(a) permits the Court to transfer this case to "any other district or division where it might have been brought" for the "convenience of parties and witnesses, in the interest of justice." 28 U.S.C. § 1404(a). A threshold question is whether the case could have been brought in the district to which transfer is sought. <u>See</u> <u>Stewart Organization v. Ricoh Corp.</u>, 487 U.S. 22, 29 (1988) (citing <u>Van Dusen v. Barrack</u>, 376 U.S. 612, 613 (1964)). The Court then must engage in a case by case analysis and balance the private interests of the parties with public interests such as efficiency and fairness.

Id. at 29; Abusadeh, 2007 WL 2111036, at *3.  The moving party bears the burden to establish

that it is proper to transfer the case.  See Southern Utah, 315 F. Supp. 2d at 86.  Trout Unlimited

v. United States Dep't of Agriculture, 944 F.Supp. 13, 16 (D.D.C. 1996) (citing Air Line Pilots

Ass'n v. Eastern Air Lines, 672 F.Supp. 525, 526 (D.D.C. 1987) (citations omitted).  Plaintiffs

could have brought this case in the Eastern District of Virginia, and both the private and public

interests favor transfer to that court.

The Eastern District of Virginia clearly is a district in which this case "might have been

brought."  Plaintiffs reside within that district.  USCIS's Washington Field Office is responsible

for adjudicating Plaintiffs' applications; therefore any relief Plaintiffs may obtain will involve

that office, which is located in Fairfax, Virginia.  See Dibbins Decl. ¶ 7.  Plaintiffs' interview

will be held at that field office on January 18, 2008, as will subsequent fingerprinting

appointments.  See id. ¶¶ 7-8.  In sum, the adjudications at issue in this action are being

conducted by USCIS staff located in the Eastern District of Virginia, making venue proper in

that court under 28 U.S.C. § 1391.  See Abusadeh, 2007 WL 2111036, at * 6 (concluding venue

was proper in Southern District of Texas because I-485 was being adjudicated there).

The private interests favor transfer.  The factors courts consider when assessing those

interests include: Plaintiff's choice of forum, Defendants' choice of forum, whether the claim

arose elsewhere, convenience of the parties, convenience of the witnesses, and ease of access to

sources of proof.  See Trout Unlimited, 944 F.Supp. at 16 (citation omitted). Although courts

generally accord substantial deference to a plaintiff's choice of forum, that deference is lessened

when the forum chosen is not the plaintiff's home forum.  See Shawnee Tribe v. United States,

298 F.Supp.2d 21, 24 (D.D.C. 2002) (citing Piper Aircraft Co. v. Reyno, 454 U.S. 235 (1981)).

Courts also apply less deference when the chosen forum has an inadequate nexus to the events in the case. See Southern Utah Wilderness Alliance, 315 F. Supp.2d at 86.

Plaintiffs' choice of forum deserves little deference because they do not reside in this District, and because this District lacks meaningful ties to the controversy. Plaintiffs reside in Virginia. See Compl.¶ 6. The Eastern District of Virginia is a more appropriate forum, because that is where the relevant decisions were and will be made. As noted, the Washington Field Office is charged with adjudicating Plaintiffs' petition for alien relative and adjustment application. See Dibbins Decl. ¶ 7. The named agency defendants will have no direct involvement in the adjudication of that application. Accordingly, this case is similar to other cases in which courts have found that the private interests favor transfer because the "primary issue in th[e] case" concerns a decision made by an agency field office, and not headquarters. Southern Utah Wilderness Alliance, 315 F. Supp.2d at 87; see, e.g., Rosales, 477 F. Supp. 2d at 216; Shawnee Tribe, 298 F. Supp.2d at 24; Sierra Club v. Flowers, 276 F.Supp. 62, 67 68 (D.D.C. 2003) (transferring case because federal officials in Florida made the relevant decision and officials in Washington, D.C. were not involved in the decision making process); see also Airport Working Group of Orange County, Inc. v. United States Dep't of Defense, 226 F. Supp.2d 227, 230-31 (D.D.C. 2002) (transferring because connection to DC was "attenuated" where D.C. officials were not actively involved in challenged decision).

The FBI's involvement in the background name check process also does not establish a close nexus to this District. The background checks are not initiated by the FBI. See Dibbins Decl. ¶ 8. The FBI's completion of those background checks is not monitored by USCIS in Washington, D.C., but rather by the Washington Field Office. See id. ¶¶ 8, 11-12. Local

28

officials at the Washington Field Office conduct the decision making process and will make the final decision. <u>See</u> <u>id.</u> ¶¶ 11-12. In sum, the FBI has a limited role regarding Plaintiff's application — to conduct the background checks and send the results to USCIS. It does not determine whether, when, or how the applications will be adjudicated. <u>See</u> Cannon Decl. ¶ 40. Accordingly, even if the FBI officer(s) conducting Aqel's national security investigations were located in Washington, D.C., that would not make this Court the proper forum.

Other private interest factors also support transfer. The Eastern District of Virginia is Defendants' choice of forum, and Defendants have legitimate reasons for the Court to transfer the case there. As noted, that district is the home jurisdiction of the Washington Field Office, which is charged with and is responsible for adjudicating Plaintiff's pending applications. It is also the district in which Plaintiffs reside. Since this case involves activities taking place in the Eastern District of Virginia, there is local interest in resolving it there. <u>See</u> <u>Schmidt v. American Institute of Physics</u>, 322 F. Supp.2d 28, 36 (D.D.C. 2004) (holding that cases should be resolved in the locale in which they arise); <u>Abusadeh</u>, 2007 WL 2111036 at *8 (transferring case to jurisdiction where USCIS field office was located because of that district's interest in resolving the dispute). That also makes the Eastern District of Virginia a more convenient jurisdiction in which to litigate this case because the people directly involved in making the determination as to Plaintiffs' applications are located in Virginia. <u>See</u> Dibbins Decl. ¶¶ 11-12.

The public interest also favors transfer. The relevant considerations include: the transferee's familiarity with governing laws, relative congestion of the calendars of the potential transferee and transferor courts, and local interests in deciding local controversies at home. <u>See</u> <u>Trout Unlimited</u>, 944 F.Supp. at 16 (citation omitted); <u>Airport Working Group of Orange</u>

County, Inc., 226 F. Supp.2d at 229.  Since this action concerns federal law, the Eastern District of Virginia is as familiar with the applicable law as the District of Columbia.

In addition, there is no evidence that the Eastern District of Virginia's docket is significantly more congested than the District of Columbia's docket.  See Trout Unlimited v. United States Dep't of Agriculture, 944 F.Supp. at 16; see also Exh. 4 (spreadsheet demonstrating caseload of both districts).   In 2006 the Eastern District had substantially fewer pending cases than this Court (3,059 in the Eastern District and 4,114 in this Court), and civil cases in the Eastern District were resolved more quickly than civil cases in this Court.  See id. Accordingly, both factors weigh in favor of the Court transferring this case to the Eastern District of Virginia.  Accordingly, both factors weigh in favor of the Court transferring this case to the Eastern District of Virginia.

The Court's analysis in Abusadeh v. Chertoff is instructive.  There, as here, the Plaintiff filed a mandamus complaint seeking to compel USCIS to complete its adjudication of a pending immigration application.  See 2007 WL 2111036 at *2.  The Plaintiff's application was pending in a local USCIS field office in Virginia.  See id. at *6.  Plaintiff filed suit in this District, and named agency officials with offices in Washington, D.C. as defendants.  See id.  District Judge Kollar-Kottelly concluded that Abusadeh's choice of forum was entitled to little deference because there were no meaningful ties between this District and pending immigration applications being adjudicated by a USCIS field office outside Washington, D.C.  See id. at *6-*8.  Further, the public interests favored transfer because both districts were equally familiar with the applicable law but the Southern District of Texas had a "superior interest in addressing the instant controversy because 'there is a local interest in having localized controversies decided at home.'"  Id. at *8.  The same is true here.

**CONCLUSION**

For the foregoing reasons, Defendants respectfully request that the Court GRANT

Defendants' motion to dismiss or, in the alternative, TRANSFER this case to the Eastern District

of Virginia.

Dated:  January 9, 2008                    Respectfully submitted,


_____

JEFFREY A. TAYLOR, D.C. BAR # 498610
United States Attorney


_____

RUDOLPH CONTRERAS, D.C. BAR #434122
Assistant United States Attorney


_____

ROBIN M. MERIWEATHER, D.C. Bar. # 490114
Assistant United States Attorney
555 Fourth St., N.W.
Washington, D.C.  20530
Phone: (202) 514-7198 Fax: (202) 514-8780
Robin.Meriweather2@usdoj.gov

OF COUNSEL:

Michael Metzgar
Associate Regional Counsel
United States Citizenship and Immigration Services
Department of Homeland Security
2675 Prosperity Avenue, Suite 310
Fairfax, VA 22031-4906

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
                                            )
OMAR AQEL &                                 )
IHSAN TALIAH ABDUR-RAHMAN,                   )
                                            )
        Plaintiffs,                  )
                                            )
v.                                          )
                                            )   No. 1:07CV01765(HHK)
EMILIO T. GONZALEZ, Director,                )
U.S. Citizenship and Immigration Services, et al. )
                                            )
        Defendants.                  )
_____)

## ORDER

        Upon consideration of Defendants' Motion to Dismiss or Transfer, it is this _____ day of _____, 200____,

        _____ ORDERED that the Motion to Dismiss be and hereby is GRANTED, and that complaint be and hereby is DISMISSED;

        _____ ORDERED that the Motion to Transfer be and hereby is GRANTED, and that the case be and hereby is TRANSFERRED to the United States District Court for the Eastern District of Virginia.

                SO ORDERED.


                _____
                UNITED STATES DISTRICT JUDGE

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| Omar Aqel and<br>Ihsan Taliah Abdur-Rahman<br><br>    Plaintiffs,<br><br>    v.<br><br>Emilio T. Gonzalez,<br>Director,<br>United States Citizenship and<br>Immigration Services, *et al.*,<br><br>    Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No. 1:07 cv 1765 (HHK) |

## DECLARATION OF SUSAN P. DIBBINS

Pursuant to 28 U.S.C. § 1746, Susan P. Dibbins declares under penalty of perjury as follows:

I, Susan P. Dibbins, hereby declare:

I am the Field Office Director of the Washington Field Office, located in Fairfax, Virginia, of District Seven of the United States Citizenship and Immigration Services (USCIS) in the Department of Homeland Security (DHS). I oversee the adjudication of applications for immigration benefits, including applications for adjustment of status. I held the position of Assistant District Director from September 2004 until April 1, 2007, when I was promoted to the position of Field Office Director. In those capacities, and based upon reasonable inquiry and my knowledge, information and belief, I state the following:

(1)    When an alien applies for adjustment of status, USCIS conducts several forms of security and background checks to ensure that the alien is eligible for the benefit

1

and that he or she is not a risk to national security or public safety. In addition to record checks against DHS's own immigration systems, these background checks currently include (a) a Federal Bureau of Investigation (FBI) fingerprint check for relevant criminal history records on the alien (e.g., arrests and convictions); (b) a check against the DHS-managed Interagency Border Inspection System (IBIS) that contains records and "watch list" information from more than twenty federal law enforcement and intelligence agencies; and (c) an FBI name check, which is run against FBI investigative databases containing information that is not necessarily revealed by the FBI's fingerprint check or IBIS. IBIS includes, but is not limited to, information related to persons who are wanted or under investigation for serious crimes or suspected of terrorism-related activity. No immigration benefit (e.g., adjustment of status, naturalization/U.S. citizenship) is granted unless and until all the above-required background checks have been completed and resolved.

(2)    These law enforcement checks can reveal significant derogatory information concerning alien applicants for immigration benefits, including applicants seeking adjustment of status. Such checks have resulted in alien applicants being found ineligible for the benefit sought, and in the USCIS's denial of the application. In some instances, the disqualifying information concerning the alien has been discovered as a result of the IBIS or FBI name checks, when it had not been revealed by a fingerprint check alone.

(3)    If a background or security check reveals verified derogatory information on the alien (i.e., a positive result), the USCIS works with other divisions of DHS and other law enforcement and intelligence agencies, as necessary, to obtain all available information concerning the derogatory record. Depending on the information, DHS/ICE may place the alien in immigration proceedings to remove him or her from the United States.

(4)    Although an alien's file may show that an FBI fingerprint check was performed, the fingerprint checks frequently do not reveal the types of derogatory

2

information described above, particularly when it is not information that has resulted in an arrest or criminal conviction. For example, persons on a "watch list" who are suspected of terrorist activity will not necessarily be identified through an FBI fingerprint check, but could be identified through an IBIS record check or an FBI name check of investigation databases.

(5)    It would be unconscionable and potentially risk the safety and security of the nation for USCIS to grant United States lawful permanent resident status to anyone without first ensuring that the government's law enforcement databases do not contain verified derogatory information about the alien. With lawful permanent resident status, a person who is a risk to the public or the nation's security could obtain work in sensitive industries and travel on transportation carriers more easily.

(6)    The applicant, Omar Aqel, A97-131-354, appears to have first co-filed his form I-485, Application to Register Permanent Residence or Adjust Status, at the same time his spouse, a native born United States Citizen, filed a form I-130, petition for alien relative. This was done in the Orlando, Florida office of the former Immigration and Naturalization Service in March of 2003.

(7)    The applicant and his wife, at some time after the filing of their joint I-130/I-485 packet in Orlando, Florida then moved to Randallstown, Maryland. This city is within the jurisdiction of the Baltimore District Office of U.S. Citizenship and Immigration Services, and the applications were received into the Baltimore office on or around August 29, 2005. An interview was conducted at the Baltimore District Office on November 10, 2005. However, before a decision could be completed the applicant moved once again, this time to Broadlands, Virginia, within the jurisdiction of the Washington Field Office, located in Fairfax, Virginia. A new interview concerning the form I-130 and the form I-485 has been scheduled at the Washington Field office for January 18, 2008.

(8)    FBI name checks were initiated on the applicant on or around May 5, 2003. USCIS has not yet received the results of the name check from the FBI as of today's date. A request to expedite this name check has not been filed with the FBI. Expedite requests require additional fees to be paid to the FBI by USCIS and USCIS is limited by the FBI as to the number of requests that can be made. Therefore, such requests are only made in exceptional circumstances. On February 20, 2007 USCIS posted a clarification of the criteria used to expedite FBI name checks on its public website. This clarification made clear that pending litigation was removed as the sole basis to support an expedite request. USCIS may continue to request an expedited FBI name check for a case in litigation if it meets one of several other approved criteria, including, but not limited to: 1. Military deployment; 2. Age-out cases not covered under the Child Status Protection Act, and applications affected by sunset provisions such as diversity visas; 3. Significant and compelling reasons, such as critical medical conditions, and 4. Loss of social security benefits or other subsistence at the discretion of the USCIS District Director.

(9)    FBI fingerprint checks of the applicant were submitted to the FBI on September 21, 2005. USCIS received the results of that fingerprint check from the FBI on September 26, 2005. The FBI fingerprint checks must be completed for each alien applicant for an immigration benefit, as required by public law 105-119. Pursuant to current USCIS policy, fingerprints so taken are valid for a period of 15 months after processing by the FBI. Therefore, the first fingerprints are now expired. Therefore the Washington Field Office of USCIS scheduled a new fingerprint appointment for December 20, 2007, but no results have been received from that appointment. This would indicate that either the applicant was not fingerprinted on December 20, 2007 or that the FBI was unable to process that set of fingerprints for some reason. Therefore, another fingerprint appointment has been scheduled for January 30, 2008 at 12:00 p.m.

(10)    IBIS checks were initiated on the applicant on November 9, 2005, and again on June 2, 2006, and are expired. A new IBIS check will be necessary.

4

(11)    In consideration of these security checks, there are issues requiring further inquiry by USCIS to determine the applicant's eligibility for lawful permanent residence status. Specifically, USCIS is still waiting for the results of the original name check from May 5, 2003 to be submitted by the FBI to USCIS for review. USCIS must also have updated fingerprint results, and an updated IBIS check.

(12)    Upon receipt and analysis of the results of the pending security checks, USCIS will continue to review Mr. Aqel's adjustment application, and the form I-130 submitted by his wife for his benefit, and complete adjudication of all applications as expeditiously as possible under the circumstances.

I declare under penalty of perjury that the foregoing is true and correct, to the best of my knowledge and belief. Executed on this Ninth day of January, 2008.

Susan P. Dibbins
Field Office Director
Washington Field Office
Fairfax, Virginia
U.S. Citizenship and Immigration Services
U.S. Department of Homeland Security

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

|  |  |
|---|---|
| Omar Aqel, et al., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No: |
| | ) 1:07-cv-01765-HHK |
| Emilio T. Gonzalez, | ) |
| et al., | ) |
| | ) |
| Defendants. | ) |

## DECLARATION OF MICHAEL A. CANNON

Michael A. Cannon, pursuant to 28 U.S.C. § 1746, declares the following:

(1)    I am currently the Section Chief of the National Name Check Program Section ("NNCPS") at the Headquarters of the Federal Bureau of Investigation ("FBI") in Washington, D.C. I have held that position since March 7, 2005.

(2)    In my current capacity as Section Chief, I supervise the National Name Check Units. The statements contained in this declaration are based upon my personal knowledge, upon information provided to me in my official capacity, and upon conclusions and determinations reached and made in accordance therewith.

(3)    Due to the nature of my official duties, I am familiar with the procedures followed by the FBI in responding to requests for information from its files pursuant to the policy and the procedures of the United States Citizenship and Immigration Services ("USCIS"). Specifically, I am aware of the name check request for Omar Aqel, the plaintiff in this civil action.

## NATIONAL NAME CHECK PROGRAM

(4)    The National Name Check Program ("Program") has the mission of disseminating information from the FBI's Central Records System in response to requests submitted by federal agencies, congressional committees, the federal judiciary, friendly foreign police and intelligence agencies, and state and local criminal justice agencies. The Central Records System ("CRS") contains the FBI's administrative, personnel, and investigative files. The Program has its genesis in Executive Order No. 10450, issued during the Eisenhower Administration. That executive order addresses personnel security issues and mandates National Agency Checks as part of the pre-employment vetting and background investigation process for prospective Government employees. The FBI performs the primary National Agency Check conducted on all United States Government employees. From this modest beginning, the Program has grown exponentially, with more and more customers seeking background information from FBI files on individuals before bestowing a privilege, such as Government employment or an appointment, a security clearance, attendance at a White House function, a "green card" or naturalization, admission to the bar, or a visa. More than 70 federal, state, and local agencies regularly request FBI name searches. In addition to serving our regular Government customers, the FBI conducts numerous name searches in direct support of the FBI's counterintelligence, counterterrorism, and homeland security efforts.

## EXPLANATION OF THE CENTRAL RECORDS SYSTEM

(5)    The FBI's CRS enables the FBI to maintain all information which it has acquired in the course of fulfilling mandated law enforcement responsibilities. The records maintained in the CRS consist of administrative, applicant, criminal, personnel, and other files

2

compiled for law enforcement purposes. This system consists of a numerical sequence of files

broken down according to subject matter. The subject matter of a file may relate to an

individual, organization, company, publication, activity, or foreign intelligence matter. Certain

records in the system are maintained at FBI Headquarters. Records which are pertinent to

specific FBI Field Offices are mostly maintained at those Field Offices.

   (6)  FBI Headquarters and each Field Division can access the CRS through the

FBI's General Indices. The General Indices are arranged in alphabetical order and consist of

indices on various subjects, including the names of individuals and organizations. Only the

information considered pertinent, relevant, or essential for future retrieval is indexed.

   (7)  Communications directed to FBI Headquarters from various Field Offices

and Legal Attaches are filed in the pertinent case files and indexed to the names of individuals,

groups, or organizations which are listed in the case captions or titles as subjects, suspects, or

victims. Searches made in the index to locate records concerning particular subjects are made by

searching the name of the subject requested in the index.

   (8)  The entries in the General Indices fall into two categories:

     (a)  "main" entries – entries that carry the name corresponding
        with the subject of a file contained in the CRS.

     (b)  "reference" entries – entries (sometimes called "cross-
        references") that generally only mention or reference an
        individual, organization, etc., that is contained in a
        document located in another "main" file.

   (9)  In 1995, the FBI implemented the Automated Case Support ("ACS")

system for its Headquarters, Field Offices, and Legal Attaches. More than 105 million records

were converted from automated systems previously utilized by the FBI. The ACS system

3

consists of the following three automated applications that support case management functions

for all investigative and administrative cases:

(a)    Investigative Case Management: This application provides
the ability to open, assign, and close investigative and
administrative cases as well as to set, assign, and track
leads. A case is opened by the Office of Origin, which sets
leads for itself and other field offices, as needed. The
offices that receive the leads are referred to as Lead Offices.
When a case is opened, it is assigned a Universal Case File
Number, which is utilized by FBI Headquarters and all
offices conducting or assisting in the investigation. Using
fictitious file number "111-HQ-12345" as an example, an
explanation of the Universal Case File Number is as
follows: "111" indicates the classification for that specific
type of investigation; "HQ" is the abbreviated form used for
the Office of Origin of the investigation (in this case, FBI
Headquarters); and "12345" indicates the individual case
file number for that particular investigation.

(b)    Electronic Case File: This application serves as the central
electronic repository for the FBI's official text-based
documents. It supports the universal serial concept, where
only the creator of a document serializes it into a file,
providing single source entry of serials into the
computerized system. All serials originated by the Office
of Origin are maintained in the Office of Origin's case file.

(c)    Universal Index: This application, sometimes referred to as
"UNI", continues the universal concepts of the ACS system
by providing a complete subject/case index to all
investigative and administrative cases. Only the Office of
Origin is required to index. However, the Lead Offices
may index additional information as needed. The Universal
Index, which consists of an index of approximately 100.0
million records, functions to index names to cases, and to
search names and cases for use in the FBI investigative and
administrative cases. Names of individuals or entities are
recorded with identifying information such as the date or
place of birth, race, sex, locality, social security number,
address, or date of event.

4

(10)    The decision to index names other than subjects, suspects, and victims is a discretionary decision made by the investigative FBI Special Agent, the supervisor in the field division conducting the investigation, and the supervising FBI Special Agent at FBI Headquarters. The FBI does not index every name in its files, but indexes only that information considered pertinent, relevant, or essential for future retrieval. Without a "key" (index) to this mass information, information essential to ongoing investigations could not be readily retrieved. The FBI files would thus be merely archival in nature and could not be effectively used to serve one of the mandated missions of the FBI, to investigate violations of federal criminal statutes. Therefore, the General Indices to the CRS files are the means by which the FBI can determine what retrievable information, if any, the FBI may have in its CRS files on a particular subject matter.

(11)    When the FBI searches a person's name, the name is electronically checked against the FBI's Universal Index. The searches seek all instances of the individual's name, social security number, and dates close to his or her date of birth, whether a main file or reference. As previously stated, any "main" file name would be that of an individual who is, himself or herself, the subject of an FBI investigation, whereas any "reference" would be an individual whose name appears as part of an FBI investigation. For example, "references" include associates, witnesses, or conspirators. Additionally, there may be a myriad of other reasons to explain why an FBI Special Agent conducting an investigation believed it important to include a particular name in the FBI's index for later recovery. The names are searched in a multitude of combinations, switching the order of first, last, and middle names, as well as combinations with only the first and last names, first and middle names, and so on. The Program

5

application searches names phonetically against the Universal Index records and retrieves similar

spelling variations (which is especially important considering that many names in our indices

have been transliterated from a language other than English).

(12)    If there is a match with a name in a FBI record, it is designated as a "Hit,"

meaning that the system has stopped on a possible match with the name being checked. If a

search comes up with a match to a name and either a close date of birth or social security

number, it is designated an "Ident."

## RESOLUTION RATE

(13)    There are four stages involved in the completion of an individual name

check: batch processing, name searching, file review, and dissemination. The first stage in the

process, batch processing, involves the transfer of the name check requests from USCIS to the

NNCPS on magnetic tapes. Each tape can hold up to 10,000 names. (Some requests are

transmitted via facsimile or verbally via telephone.) The tapes are uploaded into an FBI system

and the names are electronically checked against the FBI's Universal Index (UNI). Historically,

during the batch processing phase, approximately 68 percent of the name checks submitted by

USCIS are returned to USCIS as having "No Record" within 48-72 hours. A "No Record"

indicates that the FBI's Universal Index database contains no identifiable information regarding a

particular individual. Duplicate submissions (i.e., identically spelled names with identical dates

of birth and other identical information submitted while the original submission is still pending)

are not checked, and the duplicate findings are returned to USCIS within 48-72 hours.

(14)    The second stage in the process is name searching. For the name check

requests that are still pending after the initial electronic check, additional review is required. An

6

FBI employee in the NNCPS physically enters the applicant's name into the computer database searching different fields and information. A secondary manual name search completed typically within 30-60 days historically identifies an additional 22 percent of the USCIS requests as having "No Record," for a 90 percent overall "No Record" response rate. The results of this 22 percent also are returned to USCIS.

(15)   The third and fourth stages in the process are file review and dissemination. The remaining 10 percent are identified as possibly being the subject of an FBI record. At that point, the FBI record must be retrieved and reviewed. If the record was electronically uploaded into the FBI's ACS electronic record-keeping system, it can be reviewed quickly. If not, however, the relevant information must be retrieved from an existing paper record. Review of this information will determine whether the information is identified with the request. If the information is not identified with the request, the request is closed as a "No Record" and USCIS is so notified.

(16)   Additional searches against the FBI's Universal Index, additional manual name searches, and/or additional file review of a name check request, depending on the length of time a name check request is pending in the processing queue, may occur periodically during the name check process to ensure that stale information is updated.

(17)   Once a record is retrieved, the FBI reviews the file for possible derogatory information. Less than one percent of USCIS's requests are identified with a file containing possible derogatory information. If appropriate, the FBI forwards a summary of the derogatory information to USCIS.

7

(18)    At each stage of processing, the NNCPS generally works on the oldest name checks first – a first-in, first-served protocol. This protocol reflects that all applicants are equally deserving and ensures that all applicants are treated fairly. However, if an applicant's name check requires a review of numerous FBI records and files, even though that person came in first, the name check may require additional time until all responsive records are located and reviewed.

(19)    The general exception to the first-in, first-served policy exists when USCIS directs that a name check be handled on an "expedited" basis. USCIS determines which name checks are to be expedited based on criteria it determines. Once designated as an "expedite," that name check proceeds to the front of the queue along with other prioritized name check requests, in front of the others waiting to be processed.

(20)    Another exception to the first-in, first-served policy is a near-term effort agreed to by USCIS and the FBI to reduce the number of pending USCIS name check requests by prioritizing "single hit" name checks. This key initiative is explained in paragraph (33) below.

## GROWTH OF THE NAME CHECK PROGRAM

(21)    Prior to September 11, 2001, the FBI processed approximately 2.5 million name check requests per year. As a result of the FBI's post-9/11 counterterrorism efforts, the number of FBI name checks has grown. For fiscal year 2006, the FBI processed in excess of 3.4 million name checks.

(22)    A significant portion of the incoming name checks submitted over the past few years has been submitted by USCIS. In fiscal year 2003, 64% (approximately 3,929,000) of the total incoming name checks were submitted by USCIS; in fiscal year 2004, 46% (~1,727,000)

8

of the total incoming name checks were submitted by USCIS; in fiscal year 2005, 45% (~1,512,000) of the total incoming name checks were submitted by USCIS; and in fiscal year 2006, 45% (~1,633,000) of the total incoming name checks were submitted by USCIS.

## USCIS NAME CHECK REQUESTS

(23) In November 2002, heightened national security concerns prompted a review of the former Immigration and Naturalization Service's ("INS's") procedures for investigating the backgrounds of individuals seeking immigration benefits. It was determined that deeper, more detailed clearance procedures were required to protect the people and the interests of the United States effectively. One of the procedures identified was the FBI's name check clearance. Before November 2002, only those "main" files that could be positively identified with an individual were considered responsive to the immigration authorities name check requests. However, because that approach ran a risk of missing a match to a possible derogatory record, the FBI altered its search criteria to include "reference" files as well. From a processing standpoint, this meant the FBI was required to review many more files in response to each individual background check request.

(24) In December of 2002 and January of 2003, the former INS resubmitted 2.7 million name check requests to the FBI for background investigations of all individuals with then-pending applications for immigrations benefits for which the Immigration and Nationality Act required background investigations. Those 2.7 million requests were in addition to the regular submissions by the former INS. Currently, the FBI has returned an initial response to all 2.7 million resubmitted requests. Moreover, although many of the FBI's initial responses to those resubmitted requests indicated that the FBI had no information relating to the specific

9

individual who was the subject of the request, approximately 16 percent – or over 440,000 –

resubmitted requests indicated that the FBI may have information relating to the subject of the

inquiry. The FBI is still in the process of resolving those 440,000 requests. Currently, less than

6,300 of those resubmitted requests remain pending.

(25)    The FBI's processing of the more than 440,000 residuals has delayed the

processing of regular submissions from USCIS. A dedicated team within NNCPS has been

assigned to handle only these re-submitted name check requests. To the extent that the team

members are working on only these applications, they are unavailable to process the  normal

submissions.

(26)    There are numerous factors that have contributed to delays in the

processing of name check requests. One is the volume of incoming name checks – the total

volume of incoming name check requests combined with pending name check requests has

historically outpaced the NNCPS's available resources to process this volume. As it concerns

submissions by USCIS, for Fiscal Year 2006, USCIS submitted approximately 1,633,000 name

check requests, of which approximately 718,000 represented naturalization-related name checks

and approximately 658,000 represented adjustment of status-related name checks. As of the end

of Fiscal Year 2006, the NNCPS had over 364,600 pending USCIS name check requests, of

which over 157,300 represented naturalization-related name checks and over 157,800

represented adjustment of status-related name checks.

(27)    The number of "hits" on a name when it is reviewed may further

contribute to a delay in processing a name check request. A "hit" is a possible match with a

10

name in an FBI record. The number of times the name appears in FBI records correlates to the number of records which require review.

(28)    The processing of common names also contributes to a delay in processing a name check request. The names associated with a name check request are searched in a multitude of combinations, switching the order of first, last, and middle names, as well as combinations with just the first and last, first and middle, and so on. Without detailed information in both the file and agency submission, it is difficult to determine whether or not a person with a common name is the same person mentioned in FBI records. Common names can often have more than 200 hits on FBI records.

(29)    The accessibility of the FBI record needed for review also contributes to a delay in processing a name check request. If the date of the record predates October 1995, the paper record has to be located, retrieved, and reviewed; if the date of the record is later than October 1995, the record text may or may not be available electronically depending on the type of record and whether it has been uploaded electronically. A paper record could be at one of over 265 possible locations across the country. Requests often involve coordinating the retrieval and review of files from the various 56 different FBI field offices. One person's name check may involve locating and reviewing numerous files, all at different physical locations. Each request must be communicated internally from the NNCPS to the field, and handled according to the current priorities of the particular field office. Since it is a paper based process, it is a process subject to misplaced or misfiled files. The process is time consuming and labor intensive.

(30)    Another contributing factor which was briefly mentioned earlier in this

declaration is the expedited request. Processing an expedited case means that an employee is not

available to work on a normal name check request.

## THE NATIONAL NAME CHECK PROGRAM IS ADDRESSING THE FACTORS THAT CONTRIBUTE TO DELAYS IN PROCESSING A NAME CHECK

(31)    The FBI is seeking a number of improvements to its process. Over the

short-term:

(32)    NNCPS is continuing to develop the Name Check Dissemination Database

("NCDD"), an electronic repository for name check results, to eliminate manual and duplicate

preparation of reports to other Agencies, and provide avenues for future automation of the name

check process.

(33)    NNCPS is partnering with other Agencies to provide contractors and

personnel to process name checks. For example, the FBI and USCIS have implemented a key

initiative to use contractor resources to prioritize the processing of "Single-Hit" USCIS Name

Check requests, that is, pending name check requests that have only one FBI file potentially

identified with it that needs to be reviewed in order to process the request. By applying

contractor resources to process these "Single Hit" requests, the FBI may significantly reduce the

pending USCIS name check workload.

(34)    The FBI is in the process of hiring additional employees to fill current

vacancies and has procured an employee development program to streamline the training of new

employees, thereby significantly decreasing the amount of time needed before a new employee

12

can begin to significantly impact the NNCPS workload. These efforts have led to the development of a name check employee training manual.

(35)    NNCPS, through the Records Management Division's Records Automation Section, is scanning the paper files required for review in order to provide machine readable documents for the Dissemination Database. It is also building an Electronic Records System that allows for future automation of the name check process.

(36)    NNCPS is working with customers to streamline incoming product and to automate exchange of information.

(37)    As a mid-term improvement, NNCPS is exploring technology updates to the name check process. Specifically, the FBI procured textual analysis software in order to investigate ways to further automate the name check process. The goal is to incorporate analytical software applications that reduce the time spent to verify the identity of the individual and, once verified, assists in the adjudication analysis. This type of automation should decrease the time required to process a name check, thereby increasing production. The FBI is building a proof of concept system for eventual integration into the FBI's core databases.

(38)    As a long-term improvement, the FBI is developing a Central Records Complex that will create a central repository of records. Currently, paper files/information must be retrieved from over 265 locations throughout the FBI. The Central Records Complex will address this issue, creating a central repository-scanning of documents, and expediting access to information contained in billions of documents that are currently manually accessed in locations around the United States and world. In addition, the essential long term improvement for FBI Name Checks is to adjust the fee schedule to reflect the actual cost of providing name check

13

services. Once in place, the FBI will be able to scale resources proportionally with workload demands – pending name checks will pay for themselves. At this time fees do not cover the basic costs of providing the service. Therefore, the FBI cannot adequately apply resources to processing name checks without pulling critically needed personnel and funding from other programs. The FBI procured services to conduct a study to determine an appropriate fee structure. The independent contractor hired to conduct the study has completed its work and the proposed fee structure is undergoing the Federal rulemaking process.

(39)    For the reasons stated earlier, the FBI cannot provide a specific or general time frame for completing any particular name check submitted by USCIS. The processing of name checks, including those which are expedited at the request of USCIS, depends upon a number of factors, including where in the processing queue the name check lies; the workload of the analyst processing the name check; the volume of expedited name checks the analyst must process for, among others, military deployment, "age-outs," sunset provisions such as Diversity Visa cases, compelling reasons such as critical medical conditions, and loss of Social Security or other subsistence; the number of "Hits," (i.e., possible matches) that must be retrieved, reviewed and resolved; the number of records from various Field Offices that must be retrieved, reviewed and resolved; and, more generally, the staff and resources available to conduct the checks. Unfortunately, the proprietary software NNCPS utilizes to process name checks does not report where in the processing queue a particular name check request may lie vis-à-vis other name checks. Additionally, until review of each case is undertaken no estimate for the time required to complete it can even be attempted, no estimate can be made as to when the plaintiffs' cases will be reached by NNCPS staff, nor can any reliable estimate be made as to how long it will take to

14

complete the review once it has begun. While the FBI is sensitive to the impact of the delays in processing name check requests, the consequence of the FBI's mission on homeland security requires that its name check process be primarily focused on providing accurate and thorough results. When the name check is completed, the FBI provides the results to USCIS as quickly as possible.

(40)    It is important to note that the FBI does not adjudicate applications for benefits under the Immigration and Nationality Act. If appropriate, the FBI generally provides a summary of available information to USCIS for its adjudication process.

### PLAINTIFF'S NAME CHECK REQUEST

(41)    The name check request for plaintiff Omar Aqel was received by the FBI from USCIS on or about May 7, 2003 and has not been completed. The FBI is performing its check in response to USCIS's request in accordance with the procedures outlined above. The results of the name check will be forwarded to USCIS in Washington, D.C., in due course, in accordance with the FBI's normal protocol.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed this _17th_ day of December 2007.


MICHAEL A. CANNON
Section Chief
National Name Check Program Section
Records Management Division
Federal Bureau of Investigation
Washington, D.C.

15

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **JIANPING SUN,** | |
| **Plaintiff,** | |
| **v.** | Civil Action No.  07-504  (JDB) |
| **ALBERTO GONZALES, et al.,** | |
| **Defendants.** | |

## <u>ORDER</u>

Plaintiff Jianping Sun, a native and citizen of the People's Republic of China, brings this action against the United States Department of Justice, the United States Citizenship and Immigration Services ("USCIS"), the United States Department of Homeland Security ("DHS"), the Federal Bureau of Investigation ("FBI"), and related officials within these departments. Plaintiff asks this Court to compel defendants to adjudicate without further delay his pending Form I-485 application for an adjustment of immigration status to become a lawful permanent resident.

Plaintiff filed his Application to Register Permanent Residence or Adjust Status (Form I-485) on April 24, 2004, along with a visa petition (Form I-140).  Petition ¶ 9.  After an alien applies for an adjustment of status, USCIS conducts a number of investigations to ensure that the alien is eligible for the benefit sought and is not a risk to national security.  See Decl. of Naboone Puripongs ¶ 2; Fact Sheet at 1.  Specifically, USCIS requests (a) an FBI fingerprint check for information relating to an applicant's criminal history within the United States; (b) a check against the DHS-managed Interagency Border Inspection System that "combines information

-1-

from multiple agencies, databases and system interfaces to compile data relating to national security risks, public safety issues and other law enforcement concerns"; and (c) an FBI name check, which reviews records maintained in "administrative, applicant, criminal, personnel and other files compiled by law enforcement." Fact Sheet at 2. USCIS also maintains the discretion and the authority to conduct other background investigations when necessary. Id.

According to the USCIS Fact Sheet regarding immigration security checks, "some cases legitimately take months or even several years to resolve" due to the complex, highly sensitive information that is involved in the process. Id. at 2-3. Yet, "USCIS will never grant an immigration service or benefit before the required security checks are completed regardless of how long those checks take." Id. at 1.

Plaintiff's fingerprints were taken and submitted on April 14, 2005. Petition ¶ 9. However, two background checks remain outstanding for plaintiff's application: the FBI name check and the national security background investigation. The FBI name check request for plaintiff was received by the FBI on May 18, 2004, and remains pending. See Decl. of Michael A. Cannon ¶ 22. Also, during the processing of plaintiff's application, USCIS requested a national security screening of plaintiff, which remains ongoing. See Decl. of Naboone Puripongs ¶¶ 8-9.

Believing USCIS has unreasonably delayed the adjudication of his adjustment of status application, plaintiff filed with this Court a petition for mandamus on March 14, 2007. Defendants have now moved to dismiss plaintiff's case for lack of subject matter jurisdiction and for failure to state a claim upon which relief can be granted. The issues in this matter are controlled by this Court's decision in Orlov v. Howard, Civil Action No. 07-350, issued on this

date.  The Court refers the parties to the memorandum opinion issued in Orlov for a full

discussion of the issues.

Stated succinctly, this Court lacks jurisdiction to review the ongoing pace at which

plaintiff's application is being adjudicated.  The Immigration and Nationality Act, 8 U.S.C. §

1255(a), provides that: "The status of an alien . . . may be adjusted by the Attorney General, in

his discretion and under such regulations as he may prescribe, to that of an alien lawfully

admitted for permanent residence if" certain conditions are met.[1]  In the absence of statutorily

prescribed time limitations or statutory factors to guide USCIS in crafting regulations for the

adjustment process, Congress clearly intended to leave the pace of processing adjustment

applications within the discretion of USCIS.  Because 8 U.S.C. § 1252(a)(2)(B)(ii) divests

federal courts of jurisdiction to review a discretionary decision or action of USCIS, and an

"action" includes any discretionary act or series of acts within the adjustment of status process

(including the pace of completing various security checks), this Court lacks jurisdiction over

plaintiff's petition.[2]

_____

[1]Although the text of 8 U.S.C. § 1255 refers to the Attorney General, the discretionary
authority to adjudicate adjustment applications and promulgate regulations has been transferred
to the Secretary of Homeland Security and the United States Citizenship and Immigration
Services.  See 6 U.S.C. §§ 271(b), 557.  The Court will therefore refer to USCIS as the entity
with discretionary authority.

[2]Section 1252(a)(2)(B), provides that:

Notwithstanding any other provision of law (statutory or nonstatutory), including section
2241 of Title 28, or any other habeas corpus provision, and sections 1361 and 1651 of
such title, and except as provided in subparagraph (D), and regardless of whether the
judgment, decision, or action is made in removal proceedings, no court shall have
jurisdiction to review--
(i) any judgment regarding the granting of relief under section . . . 1255 [adjustment of
status] . . . , or

The Administrative Procedures Act ("APA") also does not confer jurisdiction upon this Court to review plaintiff's claim because the APA does not apply where "statutes preclude judicial review" or "where agency action is committed to agency discretion by law."  5 U.S.C. § 701(a)(1), (2).  And finally, mandamus may not issue here because plaintiff has failed to demonstrate that defendants have a clear duty to increase the pace at which they are processing his application and because plaintiff has failed to demonstrate that he has a clear right to the relief sought.  See In re Medicare Reimbursement Litig., 414 F.3d 7, 10 (D.C. Cir. 2005) (explaining that "a district court may grant mandamus relief if '(1) the plaintiff has a clear right to relief; (2) the defendant has a clear duty to act; and (3) there is no other adequate remedy available to the plaintiff'") (quoting Power v. Barnhart, 292 F.3d 781, 784 (D.C. Cir. 2002)).

Accordingly, upon careful consideration of the motion and the parties' memoranda, the applicable law, and the entire record, and for the reasons stated in the memorandum opinion issued on this date in Orlov v. Howard, it is this 10th day of December, 2007, hereby

**ORDERED** that [8] defendants' motion to dismiss is **GRANTED**; and it is further

**ORDERED** that the case is dismissed against all defendants.

**SO ORDERED.**

_____/s/ John D. Bates_____
JOHN D. BATES
United States District Judge

---

(ii) any other decision or action of the Attorney General or the Secretary of Homeland Security the authority for which is specified under this subchapter to be in the discretion of the Attorney General or the Secretary of Homeland Security . . . .

-4-

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **MOHAMMAD FAYYAZ and GIZELA FAYYAZ,** | |
| **Plaintiffs,** | |
| **v.** | **Civil Action 06-02016 (HHK)** |
| **DEPARTMENT OF HOMELAND SECURITY, et al.,** | |
| **Defendants.** | |

## ORDER OF TRANSFER

Before the court is the motion of defendants to transfer or, in the alternative, to dismiss [#5]. Upon consideration of the motion, the opposition thereto, and the record of this case, the court concludes that the motion to transfer this action to the Southern District of Texas should be granted. The Southern District of Texas is the more appropriate venue for this action because plaintiffs reside in Houston, Texas, the United States Citizenship and Immigration Services Office with jurisdiction over plaintiffs' adjustment application is there, and plaintiffs' alleged harm occurred there.

Accordingly, it is this 25th day of October, 2007, hereby

**ORDERED** that the Clerk of the Court shall effect the transfer of this action to the Southern District of Texas.

Henry H. Kennedy, Jr.
United States District Judge

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| NATALIA V. POLIAKOVA, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 07-1210 (RCL) |
| | § | |
| EMILIO T. GONZALEZ, DIRECTOR | § | |
| UNITED STATES CITIZENSHIP AND | § | |
| IMMIGRATION SERVICES (USCIS), | § | |
| MICHAEL CHERTOFF, SECRETARY, | § | |
| UNITED STATES DEPARTMENT OF | § | |
| HOMELAND SECURITY, | § | |
| ROBERT S. MUELLER, DIRECTOR, | § | |
| FEDERAL BUREAU OF INVESTIGATION, | § | |
| LINDA SWACINA, DIRECTOR, MIAMI | § | |
| DISTRICT OFFICE, USCIS | § | |
| | § | |
| *Defendants.* | § | |

## <u>ORDER</u>

Upon consideration of Defendants' Motion [11] to Transfer Venue and for Enlargement of

Time to File Answer, it is this 17th day of December, 2007,

ORDERED that Defendants' Motion be, and hereby is, granted, for the reasons stated well in

Defendants' response to Plaintiff's sur-reply; it is further hereby

ORDERED that this case be, and hereby is, TRANSFERRED to the Southern District of Florida;

it is further hereby

ORDERED that Defendants' Answer or other response to the complaint shall be due no sooner

than 15 days after the Southern District of Florida dockets the case in that district.

SO ORDERED.


Signed by United States District Judge Royce C. Lamberth on December 17, 2007.

# U.S. DISTRICT COURT - JUDICIAL CASELOAD PROFILE

| | | | 12-MONTH PERIOD ENDING SEPTEMBER 30 | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| **DISTRICT OF COLUMBIA** | | | 2006 | 2005 | 2004 | 2003 | 2002 | 2001 | Numerical Standing | |
| | | | | | | | | | U.S. | Circuit |
| **OVERALL CASELOAD STATISTICS** | Filings* | | 2,947 | 3,383 | 3,121 | 3,461 | 3,382 | 3,377 | U.S. | Circuit |
| | Terminations | | 3,458 | 3,305 | 3,365 | 3,101 | 3,159 | 3,291 | | |
| | Pending | | 4,114 | 4,634 | 4,422 | 4,656 | 4,338 | 4,151 | | |
| | % Change in Total Filings | Over Last Year | -12.9 | | | | | | 84 | - |
| | | Over Earlier Years | | | -5.6 | -14.9 | -12.9 | -12.7 | 69 | - |
| | Number of Judgeships | | 15 | 15 | 15 | 15 | 15 | 15 | | |
| | Vacant Judgeship Months** | | .0 | .0 | .0 | 3.1 | 17.1 | 27.4 | | |
| **ACTIONS PER JUDGESHIP** | FILINGS | Total | 197 | 226 | 208 | 231 | 225 | 225 | 91 | - |
| | | Civil | 159 | 180 | 163 | 184 | 179 | 197 | 86 | - |
| | | Criminal Felony | 25 | 30 | 32 | 35 | 34 | 28 | 92 | - |
| | | Supervised Release Hearings** | 13 | 16 | 13 | 12 | 12 | - | 73 | - |
| | Pending Cases | | 274 | 309 | 295 | 310 | 289 | 277 | 80 | - |
| | Weighted Filings** | | 239 | 272 | 261 | 280 | 271 | 284 | 88 | - |
| | Terminations | | 231 | 220 | 224 | 207 | 211 | 219 | 88 | - |
| | Trials Completed | | 7 | 10 | 15 | 15 | 12 | 12 | 93 | - |
| **MEDIAN TIMES (months)** | From Filing to Disposition | Criminal Felony | 14.4 | 12.9 | 12.8 | 10.2 | 9.6 | 7.7 | 90 | - |
| | | Civil** | 10.2 | 10.8 | 10.3 | 10.3 | 10.5 | 9.8 | 56 | - |
| | From Filing to Trial** (Civil Only) | | 37.0 | 35.0 | 27.4 | 25.0 | 29.0 | 24.0 | 74 | - |
| **OTHER** | Civil Cases Over 3 Years Old** | Number | 433 | 468 | 408 | 445 | 359 | 282 | | |
| | | Percentage | 15.1 | 14.1 | 12.8 | 12.7 | 11.1 | 8.6 | 83 | - |
| | Average Number of Felony Defendants Filed Per Case | | 1.4 | 1.5 | 1.5 | 1.3 | 1.4 | 1.3 | | |
| | Jurors | Avg. Present for Jury Selection | 70.60 | 86.63 | 75.49 | 85.69 | 93.32 | 69.99 | | |
| | | Percent Not Selected or Challenged | 47.2 | 53.6 | 50.4 | 56.6 | 55.7 | 51.9 | | |

| **2006 CIVIL AND CRIMINAL FELONY FILINGS BY NATURE OF SUIT AND OFFENSE** | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Type of | TOTAL | A | B | C | D | E | F | G | H | I | J | K | L |
| Civil | 2382 | 22 | 35 | 491 | 28 | 21 | 135 | 228 | 209 | 42 | 514 | 61 | 596 |
| Criminal* | 367 | 1 | 106 | 12 | 63 | 78 | 20 | 10 | 2 | 13 | 5 | 26 | 31 |

* Filings in the "Overall Caseload Statistics" section include criminal transfers, while filings "By Nature of Offense" do not.
** See "Explanation of Selected Terms."

# U.S. DISTRICT COURT - JUDICIAL CASELOAD PROFILE

| | | | 12-MONTH PERIOD ENDING SEPTEMBER 30 | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| **VIRGINIA EASTERN** | | | 2006 | 2005 | 2004 | 2003 | 2002 | 2001 | Numerical Standing | |
| | | | | | | | | | U.S. | Circuit |
| OVERALL CASELOAD STATISTICS | Filings* | | 5,636 | 5,837 | 6,197 | 6,052 | 10,908 | 7,207 | U.S. | Circuit |
| | Terminations | | 5,623 | 6,195 | 5,950 | 6,014 | 10,209 | 7,183 | | |
| | Pending | | 3,059 | 3,077 | 3,507 | 3,465 | 3,505 | 2,954 | | |
| | % Change in Total Filings | Over Last Year | | -3.5 | | | | | 43 | 5 |
| | | Over Earlier Years | | | -9.1 | -6.9 | -48.3 | -21.8 | 88 | 9 |
| Number of Judgeships | | | 11 | 11 | 11 | 11 | 11 | 11 | | |
| Vacant Judgeship Months** | | | 9.0 | .0 | 4.5 | .0 | .0 | 9.5 | | |
| ACTIONS PER JUDGESHIP | FILINGS | Total | 513 | 531 | 564 | 550 | 991 | 655 | 22 | 1 |
| | | Civil | 354 | 369 | 409 | 394 | 843 | 552 | 37 | 2 |
| | | Criminal Felony | 112 | 118 | 115 | 126 | 122 | 103 | 15 | 2 |
| | | Supervised Release Hearings** | 47 | 44 | 40 | 30 | 26 | - | 9 | 1 |
| | Pending Cases | | 278 | 280 | 319 | 315 | 319 | 269 | 78 | 8 |
| | Weighted Filings** | | 474 | 518 | 544 | 558 | 634 | 566 | 37 | 2 |
| | Terminations | | 511 | 563 | 541 | 547 | 928 | 653 | 26 | 2 |
| | Trials Completed | | 34 | 25 | 31 | 32 | 31 | 36 | 7 | 2 |
| MEDIAN TIMES (months) | From Filing to Disposition | Criminal Felony | 5.4 | 5.1 | 5.1 | 5.1 | 4.7 | 5.1 | 7 | 1 |
| | | Civil** | 5.9 | 5.3 | 5.7 | 5.3 | 4.4 | 3.4 | 3 | 1 |
| | From Filing to Trial** (Civil Only) | | 9.3 | 9.4 | 9.2 | 8.0 | 9.0 | 9.9 | 1 | 1 |
| OTHER | Civil Cases Over 3 Years Old** | Number | 240 | 101 | 13 | 58 | 24 | 89 | | |
| | | Percentage | 12.1 | 5.1 | .5 | 2.5 | 1.0 | 4.2 | 81 | 9 |
| | Average Number of Felony Defendants Filed Per Case | | 1.3 | 1.3 | 1.3 | 1.3 | 1.3 | 1.3 | | |
| | Jurors | Avg. Present for Jury Selection | 50.42 | 44.76 | 41.26 | 42.10 | 45.60 | 48.72 | | |
| | | Percent Not Selected or Challenged | 36.4 | 37.3 | 39.9 | 41.9 | 50.6 | 52.9 | | |

| 2006 CIVIL AND CRIMINAL FELONY FILINGS BY NATURE OF SUIT AND OFFENSE | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Type of | TOTAL | A | B | C | D | E | F | G | H | I | J | K | L |
| Civil | 3891 | 86 | 646 | 1325 | 34 | 21 | 224 | 385 | 254 | 159 | 371 | 3 | 383 |
| Criminal* | 1223 | 28 | 412 | 96 | 227 | 247 | 25 | 39 | 23 | 31 | 18 | 26 | 51 |

\* Filings in the "Overall Caseload Statistics" section include criminal transfers, while filings "By Nature of Offense" do not.

\*\* See "Explanation of Selected Terms."